UNITED STATES OF AMERICA

vs.                                                    Case No.  3:08-cr-368-J-34JRK

DAVID MARSHALL DEAL
a/k/a cptliquidice999999
a/k/a m d

                                        Defendant.
_____/

## **REPORT AND RECOMMENDATION**[1]

     This cause is before the Court on Defendant's Motion to Suppress Fruits of

Warrantless Search (Doc. No. 39; "Motion to Suppress Physical Evidence"), filed April 19,

2009, and Defendant's Motion to Suppress Statements (Doc. No. 40; "Motion to Suppress

Statements"), also filed April 19, 2009.  The Motions are opposed.  <u>See</u> United States'

Response in Opposition to Defendant's Motion to Suppress Fruits of Warrantless Search

(Doc. No. 50; "Response to Motion to Suppress Physical Evidence"); United States'

Response in Opposition to Defendant's Motion to Suppress Statements (Doc. No. 51;

"Response to Motion to Suppress Statements").  In the Motion to Suppress Physical

Evidence, Defendant seeks, on Fourth Amendment grounds, to suppress condoms, a

camera, and thong underwear that were found inside a backpack in the vehicle Defendant

was driving at the time of his arrest.  <u>See</u> Motion to Suppress Physical Evidence at 2-3.  In

---

[1]  Within ten (10) days after service of this document, specific, written objections may be filed in accordance with 28 U.S.C. § 636, Rule 59, Federal Rules of Criminal Procedure, and Rule 6.02, Local Rules, United States District Court, Middle District of Florida.  Failure to file a timely objection waives a party's right to review.  Fed. R. Crim. P. 59.

the Motion to Suppress Statements, Defendant seeks to suppress oral and written statements he made to police officers after his arrest, arguing the statements "were rendered in contravention of [Defendant]'s rights under the Fourth and Fifth Amendments to the United States Constitution, and because the statements are objectionable under [Rules] 404(b) and 403, [Federal Rules of Evidence]." Motion to Suppress Statements at 1, 3-4.

The primary issue with respect to the Motion to Suppress Physical Evidence is whether an exception to the warrant requirement of the Fourth Amendment applies to the search of Defendant's vehicle. For the reasons explained more fully herein, the undersigned concludes that two exceptions to the warrant requirement apply: (1) the automobile exception; and (2) the exception for a search incident to arrest. The automobile exception applies because information uncovered during the investigation of Defendant established probable cause to believe his vehicle contained evidence. The search incident to arrest was permissible because there was probable cause for Defendant's arrest on both state and federal charges, and there was reason to believe Defendant's vehicle might contain evidence of the crime for which he was arrested.

At the April 28, 2009 hearing, the parties suggested, and the undersigned agreed, that Defendant's arguments under Rules 404(b) and 403, Federal Rules of Evidence are more properly raised in a motion in limine. Therefore, the primary issues with respect to the Motion to Suppress Statements are whether there was probable cause to arrest Defendant, whether Defendant validly waived his constitutional rights under Miranda v. Arizona, 384 U.S. 436 (1966), and whether the statements Defendant made to police officers were

voluntary. The undersigned concludes, as previously stated, that there was probable cause to arrest Defendant. In addition, Defendant validly waived his constitutional rights, and his statements to the police were voluntary. Accordingly, the undersigned recommends that both the Motion to Suppress Physical Evidence and the Motion to Suppress Statements be denied.

## I. Background

On October 8, 2008, a federal grand jury returned an Indictment charging Defendant with attempting to entice a person Defendant believed to be under the age of eighteen years to engage in sexual activity by using means of interstate and foreign commerce, in violation of 18 U.S.C. § 2422(b). See Indictment (Doc. No. 1). Defendant was arrested by federal authorities on November 5, 2008, and he made his initial appearance that same day. Minute Entry (Doc. No. 6). On November 7, 2008, Defendant was arraigned and pleaded not guilty. See Minute Entry (Doc. No. 13).

On March 11, 2009, the grand jury returned a Superseding Indictment charging Defendant with attempting to entice a person Defendant believed to be under the age of eighteen years to engage in sexual activity by using means of interstate and foreign commerce, in violation of 18 U.S.C. § 2422(b), and attempting to entice a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction by using materials that were shipped or mailed in interstate and foreign commerce, in violation of 18 U.S.C. §§ 2251(a) and (e). See Superseding Indictment (Doc. No. 32). Defendant was rearraigned and pleaded not guilty. See Minute Entry (Doc. No. 34).

On April 19, 2009, Defendant filed the Motion to Suppress Physical Evidence and Motion to Suppress Statements.  An evidentiary hearing on the motions was held on April 28, 2009.  See Minute Entry (Doc. No. 56).

On May 12, 2009, the grand jury returned a Second Superseding Indictment charging Defendant with two counts of knowingly transporting in interstate commerce visual depictions that involved a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(1), attempting to entice a person Defendant believed to be under the age of eighteen years to engage in sexual activity by using means of interstate and foreign commerce, in violation of 18 U.S.C. § 2422(b), and attempting to entice a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction by using materials that were shipped or mailed in interstate and foreign commerce, in violation of 18 U.S.C. §§ 2251(a) and (e).  See Second Superseding Indictment (Doc. No. 59).  On May 18, 2009, Defendant was rearraigned and pleaded not guilty.  See Minute Entry (Doc. No. 64).

On May 27, 2009, the grand jury returned a Third Superseding Indictment charging Defendant with two counts of knowingly transporting in interstate commerce visual depictions that involved a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(1), attempting to entice a person Defendant believed to be under the age of eighteen years to engage in sexual activity by using means of interstate and foreign commerce, in violation of 18 U.S.C. § 2422(b), and attempting to entice a person Defendant believed to be under the age of eighteen years to engage in sexually explicit conduct for the purpose of producing a visual depiction by using materials that were shipped or mailed in interstate and foreign commerce, in violation of 18 U.S.C. §§ 2251(a) and (e).  See Third

Superseding Indictment (Doc. No. 68). On June 2, 2009, Defendant was rearraigned and pleaded not guilty. See Minute Entry (Doc. No. 71).

On June 17, 2009, Defendant Deal's Motion to Suppress Fruits of Search of Yahoo Account (Doc. No. 80) was filed, which will be addressed in a separate report and recommendation.

## II. Testimony

Kurt Morgan Jones is a Detective with the Jacksonville Sheriff's Office and is a member of the North Florida Internet Crimes Against Children Task Force.[2] See Minute Entry (Doc. No. 56); Transcript of April 28, 2009 Suppression Hearing (Doc. No. 63; "Tr.") at 34. He is assigned to investigate crimes against children, particularly the possession and trading of child pornography, as well as the online enticement or solicitation of children for sexual acts. Tr. at 35. On August 28, 2008, Detective Jones was online in the "romance" chat room[3] of the Yahoo! network posing as a thirteen-year-old girl named Alice with the screen name "lil_jax_gurl." Tr. at 36-37. Detective Jones, as Alice, "joined" the chat room so that his screen name and profile were visible to the other individuals in the chat room. Tr. at 37-38. Cptliquidice999999, Defendant's alleged screen name, contacted Detective Jones by instant message under the mistaken belief that Detective Jones was "Alice."[4] Tr. at 38-39. Transcripts of the communications between Detective Jones and

---

[2] Detective Jones is cross sworn with U.S. Immigration & Customs Enforcement, giving him federal credentials and federal law enforcement authority. Tr. at 34-35.

[3] A "chat room" is a real-time online interactive discussion group. Merriam Webster's Online Dictionary, available at http://www.merriam-webster.com/dictionary/chatroom (last visited July 6, 2009).

[4] Hereafter, "Alice" and Detective Jones are used interchangeably.

cptliquidice999999 were admitted into evidence without objection at the April 28, 2009 hearing.[5]  Tr. at 41-46; <u>see</u> Government's Exhibits 2-12.  During their online conversation on August 28, 2008, at 3:21 p.m., cptliquidice999999 stated that he had seen Alice's profile on vampirefreaks.com.  Government's Exhibit ("Gov. Ex.") 2.  Detective Jones testified that Alice's profile on vampirefreaks.com indicated she was thirteen years old.  Tr. at 53.  At 3:40 p.m., the following exchange took place:

> cptlinquidice999999: do you have any problem with me being 22?[[6]]
> lil_jax_gurl:  no .. 22 is great .... usually it[']s my age that is the problem
> cptlinquidice999999: well [I]'d rather be with someone younger
> cptlinquidice999999: most people think that[']s f[***]ed up
> lil_jax_gurl: yea?  that[']s kewl .... so like 13 is ok with u ...
> cptlinquidice999999: yea[h]

Gov. Ex. 2.

According to Detective Jones's testimony, on August 28, 2008, cptliquidice999999 also sent photographs of himself, a boat, a motorcycle, a truck, and a car to Alice via the internet.  Tr. at 48.  Based on the registration number on the boat, driver's license records, and photographs, Detective Jones identified Defendant as cptliqidice999999.  Tr. at 48.  A review of the communications between cptliquidice999999 and Alice reveals that on August 28, 2008, cptliquidice999999 asked for a picture of Alice and said she looked "really hot."  Gov. Ex. 2.  Cptliquidice999999 and Alice discussed school, Alice's frustration with her fictional parents, drinking alcohol, going to the mall, and going to the beach.  Gov. Ex. 2.

---

[5]  Detective Jones explained that the transcript logs reflect a screen name with the spelling "cptl**in**quidice999999" (emphasis added); however, the profile of this screen name reflected the spelling "cptliquidice999999."  Tr. at 38-39.

[6]  Defendant was twenty-two years old at the time of his arrest; he is currently twenty-three years old.

Cptliquidice999999 asked for a picture of Alice in a bathing suit. Gov. Ex. 2. After discussing their respective ages, Defendant stated, "[M]an now I do feel like I'd be rob[b]ing the cradle." Gov. Ex. 2. On August 28, 2008, cptliquidice999999 and Detective Jones communicated for more than two hours. Gov. Ex. 2.

On August 29, 2008, cptliquidice999999 contacted Alice again. Gov. Ex. 3. Alice told cptliquidice999999 that she was going out of town for the weekend. Gov. Ex. 3. They communicated for approximately one-half hour. Gov. Ex. 3.

On September 4, 2008, cptliquidice999999 attempted to contact Alice, but Detective Jones did not respond. Gov. Ex. 4.

On September 5, 2008, cptliquidice999999 contacted Alice, and they communicated for approximately one and one-half hours. Gov. Ex. 5. Cptliquidice999999 told Alice he wanted to see her, and they discussed dates and times they could meet, and activities they could do on a date. Gov. Ex. 5. They also discussed Alice's genitalia. Gov. Ex. 5.

On September 6, 2008, Detective Jones contacted cptliquidice999999, and they communicated for a total of approximately one and one-half hours. Gov. Ex. 6. Cptliquidice999999 asked if Alice could meet him, and Alice indicated she might be able to "sneak." Gov. Ex. 6. At approximately 3:40 p.m., they made plans to meet at Dave and Buster's restaurant later that day. Gov. Ex. 6. Cptliquidice999999 told Alice he would be in a blue Tahoe vehicle, and he would meet her twenty minutes later. Gov. Ex. 6. Detective Jones testified that he went to Dave and Buster's; he arrived there at approximately 4:00 p.m. and parked in the parking lot. Tr. at 49-50. Detective Jones testified he saw a blue Tahoe drive into the parking lot. Tr. at 50. The blue Tahoe was driven by Defendant, whose

identity Detective Jones confirmed based on the photographs that had been sent to Alice, the name associated with the registration number on the boat in those photographs, and driver's license records.  Tr. at 48, 50-51.  According to Detective Jones's testimony, Defendant parked, remained in his vehicle, and then left a short time later.  Tr. at 50-51. Detective Jones then sent a message to Defendant explaining that Alice's mother had caught Alice sneaking out of her house.  Gov. Ex. 6.

On September 7, 2008, cptliquidice999999 and Alice communicated for approximately one and one-half hours.  Gov. Ex. 8.  Cptliquidice999999 asked for Alice's size so he could buy her a bikini.  Gov. Ex. 8.  Cptliquidice999999 asked when Alice could meet him.  Gov. Ex. 8.  Cptliquidice999999 told Alice he wanted to get some "pics" of her. Gov. Ex. 8.

On September 8, 2008, cptliquidice999999 contacted Alice.  Gov. Ex. 9.  They communicated for approximately one hour.  Gov. Ex. 9.  Cptliquidice999999 asked Alice if she wanted to see a movie that Thursday, and Alice responded that she did.  Gov. Ex. 9. Cptliquidice999999 asked if Alice would wear something "sexy."  Gov. Ex. 9.

On September 9, 2008, cptliquidice999999 contacted Alice.  Gov. Ex. 10.  They communicated for almost three hours.  Gov. Ex. 10.  Cptliquidice999999 asked Alice, "[H]ow far do you want to go?"  Gov. Ex. 10.  Alice responded, "[I] mean like .. [I']m scared if we do anything that [I] c[o]uld get pregn[an]t at or anyt[h]ing."  Gov. Ex. 10.  Cptliquidice999999 then stated, "[W]ell [I] would always wear a condom and [I] wouldn't want to get you pregnant."  Gov. Ex. 10.  Cptliquidice999999 also stated, "[I]t's fine if we do not go all the way the first time."  Gov. Ex. 10.  Cptliquidice999999 then stated, "[W]ell if we do have sex

[I] will go slow and make sure it doesn't hurt any." Gov. Ex. 10. They discussed Alice's sexual history, and they discussed sexual activities in which Alice would be willing to engage with Defendant. Gov. Ex. 10. Alice mentioned meeting at Dave and Buster's Restaurant. Gov. Ex. 10. Cptliquidice999999 told Alice he wanted to take some "revealing" pictures of her and suggested that such pictures could be taken in his car. Gov. Ex. 10. Cptliquidice999999 told Alice he wanted her to wear a schoolgirl outfit on their date. Gov. Ex. 10. Cptliquidice999999 indicated he wanted to give Alice thong underwear, and he wanted to take a picture of her wearing it, as well as a picture of her not wearing it. Gov. Ex. 10. Alice told him he could have such a picture "if ur nice." Gov. Ex. 10. Cptliquidice999999 said he could not wait to see her "p***y." Gov. Ex. 10. When Alice said that was "ok" with her, cptliquidice999999 told her she was "awesome," and that "most girls your age wouldn't." Gov. Ex. 10.

On September 10, 2008, cptliquidice999999 contacted Alice. Gov. Ex. 11. They communicated for approximately forty-five minutes. Gov. Ex. 11. Alice asked cptliquidice999999 if he still wanted to meet at Dave and Buster's restaurant the next day at 5:30 p.m. Gov. Ex. 11. Cptliquidice999999 confirmed that he did. Gov. Ex. 11. Cptliquidice999999 told Alice, "[I] wanna do it," and "we might have to do it tomorrow." Gov. Ex. 11. He also said, "[you] have all the way up until [I] put it in you to backout of doing it." Gov. Ex. 11.

On September 11, 2008, cptliquidice999999 contacted Alice to confirm their 5:30 p.m. meeting at Dave and Buster's. Gov. Ex. 12. After their last communication, Detective Jones began to make preparations to arrest Defendant. Tr. at 55. Detective Jones had contacted

the Florida Attorney General's Office Cyber Crime Sexual Predator Unit to request assistance in making the arrest. Tr. at 55. Captain Clay Parker of the Florida Attorney General's Office, Investigator Mark Baker of the Florida Attorney General's Office, Child Predator Unit,[7] Lieutenant David Mauer, and a Jacksonville Sheriff's Deputy in a police cruiser were present to assist Detective Jones with the arrest. Tr. at 58. There was a pre-arrest briefing in the office of the United States Immigration and Customs Enforcement ("ICE Office") on Belfort Road in Jacksonville, Florida. Tr. at 12-14. At the briefing, Detective Jones provided the other officers with background information, including a summary of the above-described communications. Tr. at 56. The officers were also given a description of Defendant and his vehicle to help the officers identify Defendant. Tr. at 56. Detective Jones further informed the other officers that Defendant had indicated he would be bringing condoms and thong underwear, and that Defendant wanted to take photographs of Alice. Tr. at 56-57.

After the briefing, the officers began "gearing up" in the parking lot of the ICE Office. Tr. at 12-14, 57. Dave and Buster's is adjacent to the parking lot of the ICE Office. Tr. at 27-28. While the officers were gearing up, Defendant drove through the staging area. Tr. at 15, 26-27, 58. Defendant was driving the same blue Tahoe he had driven when he attempted to meet Alice on September 6, 2008. Tr. at 58. Although Defendant was traveling from the direction of Dave and Buster's, Detective Jones could not say that Defendant had actually been to the Dave and Buster's parking lot prior to driving through the staging area. Tr. at 59. Defendant was driving toward the exit of the parking lot when

---

[7] Investigator Mark Baker also testified at the April 28, 2009 hearing.

Detective Jones moved to position his vehicle in front of Defendant's vehicle. Tr. at 58-59. Investigator Baker's vehicle was positioned behind Defendant's vehicle at that time. Tr. at 15. Detective Jones drew his weapon and ordered Defendant to put his hands on the steering wheel. Tr. at 59. The other officers, except for Investigator Baker, converged on Defendant's vehicle with their weapons drawn. Tr. at 16, 60. Investigator Baker approached Defendant's vehicle and extracted Defendant from it. Tr. at 15-17, 60-61. Investigator Baker moved Defendant so that he was facing the vehicle against the driver's side rear passenger door. Tr. at 17. Investigator Baker handcuffed and detained Defendant. Tr. at 17, 63-64.

After Defendant was secured, Detective Jones approached Defendant. Tr. at 61. Detective Jones was wearing an audio recording device. Tr. at 61-62. The audio recording was admitted into evidence without objection. Tr. at 62; Gov. Ex. 1. Detective Jones approached Defendant, confirmed his identity, and told him, "We need to figure some stuff out here. Um, as of right now, I don't know exactly what's going on, but there's enough going on for me to detain you. Alright? Then we'll give you an opportunity to say whatever you want." Gov. Ex. 1 at 0:35-0:54.[8] Detective Jones then advised Defendant of his constitutional rights in accordance with Miranda v. Arizona, 384 U.S. 436 (1966),[9] and Defendant acknowledged these rights. Gov. Ex. 1 at 0:56-1:23.

---

[8] Time references are to the audio recording submitted as Government's Exhibit 1.

[9] Detective Jones advised Defendant, "You have the right to remain silent. You don't have to make a statement or say anything. Anything that you say can be used against you in court. You have the right to talk to a lawyer before you make a statement and before any questions are asked of you, and to have a lawyer with you during any questioning. If you cannot afford to hire a lawyer, one will be appointed for you before any questioning, if you wish, and if you do answer questions, you have right to stop answering questions at any time to consult with a lawyer." Gov. Ex. 1 at 0:55-1:18.

Detective Jones told Defendant that the mother of a thirteen-year-old "young lady" discovered her daughter was going to meet Defendant. Gov. Ex. 1 at 1:27-1:43. Defendant admitted he went to Dave and Buster's to meet a girl, but he said he did not know she was thirteen years old. Gov. Ex. 1 at 1:35-2:15. Defendant recognized Alice's online profile as the girl with whom he was communicating online. Gov. Ex. 1 at 2:26-2:39. Defendant apologized, said he had two younger sisters, and said he "wasn't planning on doing anything with her." Gov. Ex. 1 at 2:45-2:58. Detective Jones said, "Alright. Well, we might be able to straighten some of this out then. What we're going to do is we're going to take you somewhere out of this parking lot where everybody ain't looking at you, and we're going to go over this if you're willing to." Gov. Ex. 1 at 3:00-3:07. Lieutenant Maurer took Defendant to the ICE Office, which was between approximately fifty yards and one quarter mile from the location in the parking lot where Defendant was initially detained. Tr. at 20, 50, 63-64. Detective Jones went to the ICE Office shortly thereafter. Tr. at 64. Outside of Defendant's presence, Detective Jones said, "Mr. Deal is under arrest–or, in custody, rather." Gov. Ex. 1 at 4:09-4:14.

Defendant's vehicle was moved approximately twenty to thirty yards to a parking space so that it would not block traffic. Tr. at 20. Law enforcement officers were in possession of the keys to the vehicle at that point. Tr. at 30. Detective Jones asked Investigator Baker to search Defendant's vehicle for underwear and condoms. Tr. at 19-20, 29, 64-65.

Detective Jones then went to the ICE Office to interrogate Defendant. Tr. at 64-65. Once in the ICE Office, Defendant stated that he had graduated from high school and had

been attending college "on and off" for the past four years. Gov. Ex. 1 at 8:29-8:45. Detective Jones asked Defendant if Defendant had been drinking or had taken any drugs or medication that would impair his judgment, and Defendant responded he had not. Gov. Ex. 1 at 8:45-9:01, 9:21-9:28. Defendant was again advised of his constitutional rights, and Defendant acknowledged these rights in writing. Gov. Ex. 1 at 9:30-10:42; Gov. Ex. 16.

After these preliminary questions, Detective Jones interviewed Defendant. Defendant was shown a transcript of the communications between Detective Jones and cptliquidice999999. Gov. Ex. 1 at 11:15-12:30; 14:02-14:15. Defendant admitted having communicated with Alice for a week, Gov. Ex. 1 at 10:47-10:52, and he admitted knowing the content of the communications. Gov. Ex. 1 at 14:10-14:20. Detective Jones asked Defendant for permission to search his Yahoo! "friends list." Gov. Ex. 1 at 18:01-18:07. Defendant responded, "I would rather you not." Gov. Ex. 1 at 18:08-18:14. When asked whether he was communicating about "engaging in full blown sexual intercourse" with Alice, Defendant admitted he was, but he also stated he "just wanted to meet her" and was not actually going to have sexual intercourse with her. Gov. Ex. 1 at 22:57-23:41.

Defendant was asked other questions about the details of Defendant's computer use and online activities. Gov. Ex. 1 at 25:00-29:27. During the interview, Defendant asked for a trash can because he felt "light-headed" and like he might "throw-up."[10] Gov. Ex. 1 at 29:46-29:52. Defendant was given a trash can, but he did not vomit. Gov. Ex. 1 at 29:57. Defendant was also offered water. Gov. Ex. 1 at 30:03-30:07, 31:35.

---

[10] In the Motion to Suppress Statements, Defendant states that he told the officer he had been ill earlier in the day. Motion to Suppress Statements at 3.

Meanwhile, Investigator Baker was searching the blue Tahoe Defendant had been driving. Tr. at 19-21, 64-65, 69. In the front seat area, Investigator Baker found a black backpack that was zipped closed. Tr. at 21. The backpack contained condoms, thong underwear, and a camera. Tr. at 21. Pictures of the backpack and its contents were admitted into evidence without objection. Gov. Exs. 13-15; Tr. at 23, 70. Investigator Baker took the backpack to Detective Jones. Gov. Ex. 1 at 30:17; Tr. at 22-23. Back at the ICE Office, Defendant was asked, "Is there anything else in your car? Because we're allowed to look in it when we arrest you and you [inaudible]." Gov. Ex. 1 at 30:23-30:29. Defendant was told that he was being arrested for traveling to meet a minor for the purpose of having sexual relations, and for solicitation of a minor to have sexual relations. Gov. Ex. 1 at 40:19-40:38. Detective Jones offered to allow Defendant to write an apology letter to the prosecuting attorney, and Defendant agreed to do so. Gov. Ex. 1 at 54:55-56:08; Gov. Ex. 17.

### III. Summary of Argument

Defendant seeks to suppress condoms, a camera, and thong underwear that were found in the backpack in the vehicle he was driving at the time of his arrest, arguing they were discovered during a search that was conducted in violation of the Fourth Amendment. See Motion to Suppress Physical Evidence at 2-3. Specifically, Defendant contends "the authorities lacked probable cause to search the vehicle, [Defendant] did not consent to the search, and the search was conducted in the absence of a search warrant." Id. In addition, Defendant seeks to suppress his written and oral post-arrest statements, arguing that the authorities lacked probable cause to arrest him, that he did not validly waive his Miranda

rights, and that the statements were not made voluntarily. <u>See</u> Motion to Suppress Statements at 1, 3-4. In response, the United States asserts that probable cause did exist to arrest Defendant, and it was reasonable to believe the vehicle contained evidence of the offense for which Defendant was arrested. <u>See</u> Response to Motion to Suppress Physical Evidence at 8, 10-12 (citing <u>Arizona v. Gant</u>, 129 S. Ct. 1710 (2009)). The United States also contends there was probable cause to search the vehicle. <u>See</u> Response to Motion to Suppress Physical Evidence at 12. With respect to Defendant's statements, the United States asserts the statements were voluntarily made after Defendant had validly waived his constitutional rights. <u>See</u> Response to Motion to Suppress Statements at 10-16.

## IV.  Analysis

### A.  Motion to Suppress Physical Evidence

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Generally, the Fourth Amendment requires law enforcement officers to obtain a warrant before conducting a search. <u>Maryland v. Dyson</u>, 527 U.S. 465, 466 (1999). "'[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are <u>per</u> <u>se</u> unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions.'" <u>Gant</u>, 129 S. Ct. at 1716 (quoting <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)). Two exceptions to the warrant

requirement apply here: the automobile exception, see Carroll v. United States, 267 U.S. 132 (1925); and the exception for searches incident to arrest, see Gant, 129 S. Ct. at 1714.[11]

### 1. The Automobile Exception

The United States Supreme Court has determined that a warrantless search of an automobile in transit is not unreasonable under the Fourth Amendment because the automobile's mobility makes obtaining a search warrant impracticable. United States v. Ross, 456 U.S. 798, 806-07 (1982); see also Dyson, 527 U.S. at 466-67; Carroll, 267 U.S. at 153-54. "Under the automobile exception, agents may conduct a warrantless search of a vehicle if (1) the vehicle is readily mobile (i.e., operational); and (2) agents have probable cause to believe the vehicle contains contraband or evidence of a crime." United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006). When the automobile exception applies, police officers may "conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant particularly describing the place to be searched." Ross, 456 U.S. at 800, 823-24 (internal quotation and citation omitted).

Here, the vehicle driven by Defendant was mobile and operational. However, Defendant disputes that there was probable cause to arrest him or search his vehicle. "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." United States v. Lopez-Garcia, 565 F.3d 1306, 1314 (11th Cir. 2009) (quotation and citation omitted). Probable cause to search

---

[11] "The question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers." Preston v. United States, 376 U.S. 364, 366 (1964) (citing Elkins v. United States, 364 U.S. 206 (1960)).

a vehicle exists when, "under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found." <u>Tamari</u>, 454 F.3d at 1261-62 (quotation and citation omitted).

The evidence establishes there was both probable cause to arrest Defendant, and probable cause to believe Defendant's vehicle contained evidence of a crime. Detective Jones was investigating Defendant for the enticement of a minor to engage in unlawful sexual conduct and traveling to meet a minor to engage in unlawful sexual conduct, in violation of Florida law. <u>See</u> Fla. Stat. §§ 847.0135(3) and (4).[12] The crime of soliciting a child for unlawful sexual conduct using computer services or devices requires proof of three elements: (1) the defendant knowingly used a computer online service, internet service, or any other device capable of electronic data storage to contact the victim; (2) the victim was believed by the defendant to be a child; and (3) the defendant seduced, solicited, or enticed,

---

[12]     Section 847.0135(3)(a) of the Florida Statutes provides as follows:
         (3) Certain uses of computer services or devices prohibited.–  Any person who knowingly uses a computer online service, Internet service, local bulletin board service, or any other device capable of electronic data storage or transmission to:
         (a) Seduce, solicit, lure, or entice, or attempt to seduce, solicit, lure, or entice, a child or another person believed by the person to be a child, to commit any illegal act described in chapter 794, chapter 800, or chapter 827, or to otherwise engage in any unlawful sexual conduct with a child or with another person believed by the person to be a child . . . commits a felony of the third degree . . . .

         Section 847.0135(4)(a) of the Florida Statutes provides as follows:
         (4) Traveling to meet a minor.– Any person who travels any distance either within this state, to this state, or from this state by any means, who attempts to do so, or who causes another to do so or attempt to do so for the purpose of engaging in any illegal act described in chapter 794, chapter 800, or chapter 827, or to otherwise engage in any unlawful sexual conduct with a child or with another person believed by the person to be a child after using  a computer online service, Internet service, local bulletin board service, or any other device capable of electronic data storage or transmission to:
         (a) Seduce, solicit, lure, or entice or attempt to seduce, solicit, lure, or entice a child or another person believed by the person to be a child, to commit any illegal act described in chapter 794, chapter 800, or chapter 827, or to otherwise engage in any unlawful sexual conduct with a child or with another person believed by the person to be a child . . . commits a felony of the second degree . . . .

or attempted to seduce, solicit, or entice, the victim to engage in an act described in section 800.04(4)(a) or (b) of the Florida Statutes.[13]  See Florida Standard Jury Instructions in Criminal Cases, No. 11.17(a) (modified).  The crime of traveling to meet a minor to engage in sexual conduct requires proof of the following four elements: (1) the defendant knowingly traveled or attempted to travel within Florida; (2) the defendant did so for the purpose of engaging in an act described in section 800.04(4)(a) or (b) of the Florida Statutes after using a computer online service, internet service, or any other device capable of electronic data storage to contact a child; (3) the victim was a child or a person believed by the defendant to be a child; and (4) the defendant seduced, solicited, enticed, or attempted to seduce, solicit, or entice the victim to engage in an act described in section 800.04(4)(a) or (b) of the Florida Statutes.  See Florida Standard Jury Instructions in Criminal Cases, No. 11.17(c) (modified).  There exists a similar crime under federal law.  See 18 U.S.C. § 2422(b).[14]

Under federal law, the crime of enticement of a minor to engage in sexual activity requires proof of the following four elements: (1) the defendant knowingly used a computer to attempt to persuade, induce, or entice an individual under the age of eighteen to engage in sexual

---

[13]     Sections 800.04(4)(a) and (b) of the Florida Statutes provide as follows:
       (4) Lewd or lascivious battery.– A person who:
       (a) Engages in sexual activity with a person 12 years of age or older but less than 16 years of age; or
       (b) Encourages, forces, or entices any person less than 16 years of age to engage in sadomasochistic abuse, sexual bestiality, prostitution, or any other act involving sexual activity commits lewd or lascivious battery, a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

[14]  Section 2422(b) of Title 18, United States Code provides as follows:
       (b) Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

activity; (2) the defendant believed that such individual was less than eighteen years of age; (3) that if the sexual activity had occurred, the defendant could have been charged with a criminal offense under the law of Florida; and (4) the defendant acted knowingly and willfully. See Eleventh Circuit Pattern Jury Instructions, No. 80 (modified).[15]

Here, Defendant sent Alice instant message communications, the contents of which show he believed he was communicating with a thirteen-year-old girl.[16] Defendant communicated with Alice for a total of almost twelve hours during a period of approximately two weeks, part of which time was spent discussing Alice's genitalia and sexual experience. Defendant made statements indicating that he wanted to engage in sexual activity with Alice, and that he would travel to meet Alice for that purpose. Defendant arranged a meeting with Alice for September 6, 2008, and Defendant arrived at the meeting place at the designated time. Defendant arranged another meeting with Alice for September 11, 2008, and Defendant arrived at the designated time near the place where they had arranged to meet. Defendant told Alice he would bring her thong underwear, that he would take pictures of her with and without the thong underwear, and that he would wear a condom while having intercourse with her. These facts establish probable cause to believe Defendant had violated Florida law and federal law.

---

[15] A conviction for attempt would require proof of two additional elements: (1) that Defendant knowingly and willfully intended to commit the offense of enticement of a minor to engage in sexual activity; and (2) Defendant engaged in conduct which constituted a substantial step toward the commission of the crime and which strongly corroborates Defendant's criminal intent. See Eleventh Circuit Pattern Jury Instructions, No. 11 (modified).

[16] "[A]n actual minor victim is not required for an attempt conviction under 18 U.S.C. § 2422(b)." United States v. Root, 296 F.3d 1222, 1227 (11th Cir. 2002). A defendant's "belief that a minor was involved is sufficient to sustain an attempt conviction under 18 U.S.C. § 2422(b)." Id. (emphasis added).

Although Defendant argues that "[m]ere presence at a crime scene without more does not constitute probable cause," Motion to Suppress Physical Evidence at 3, the circumstances involved more than Defendant's mere arrival at the meeting place. The investigation of Defendant revealed facts and circumstances which warranted a reasonable belief that Defendant was committing the crimes for which he was arrested, and that the vehicle he was driving contained evidence of those crimes. Defendant communicated with Alice for an extended period of time, a substantial portion of which consisted of sexually explicit discussions; Defendant indicated his desire to engage in sexual intercourse with Alice, and he traveled to meet her for that purpose. Probable cause to search Defendant's vehicle was established by his statements that he would bring thong underwear, use condoms, and take photographs of her. Cf. United States v. Grossman, 233 F. App'x 963, 968 (11th Cir. 2007) (unpublished) (finding probable cause for search of vehicle when the defendant indicated he would bring lubricant to a meeting with a police officer posing as a mother who offered to allow the defendant to engage in sexual activity with her fictitious nine-year-old daughter).

There is no dispute that the vehicle Defendant was driving was mobile. In addition, the officers had probable cause to believe the vehicle contained evidence of criminal activity. Therefore, the automobile exception to the warrant requirement applies. See Tamari, 454 F.3d 1259, 1261.

Based on testimony elicited at the April 28, 2009 suppression hearing, two additional points warrant consideration. First, when Defendant was stopped and arrested, law enforcement officers took possession of the keys to the blue Tahoe he was driving, and the

vehicle was moved twenty to thirty yards before it was searched. Tr. at 20, 30. Under the automobile exception, police may move a vehicle before they search it. "[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." Michigan v. Thomas, 458 U.S. 259, 261 (1982) (citation omitted). "It is thus clear that the justification to conduct a warrantless search does not vanish once the car has been immobilized . . . ." Id.; see also United States v. Johns, 469 U.S. 478, 484-85 (1985); Florida v. Meyers, 466 U.S. 380, 382 (1984); United States v. Parrado, 911 F.2d 1567, 1571 (11th Cir. 1990). Here, law enforcement officers moved Defendant's vehicle approximately twenty to thirty yards so that it would not block traffic in a public parking lot, and the search was conducted shortly thereafter. The automobile exception applies even though the vehicle was in police custody. See Thomas, 458 U.S. at 261.

Second, Defendant seeks to suppress evidence found inside a backpack that was in the vehicle. The scope of a search under the automobile exception "is defined by the object of the search and the places in which there is probable cause to believe that it may be found." Ross, 456 U.S. at 824. Law enforcement officers "may conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant particularly describing the place to be searched." Id. at 800 (quotation omitted). This includes "a probing search of compartments and containers within the vehicle whose contents are not in plain view." Id. Here, this includes the backpack.

### 2. Search Incident to Arrest

The second exception to the warrant requirement applicable here is a search incident to arrest.  See Gant, 129 S. Ct. at 1714.  For the reasons explained supra at 19-20, there was probable cause to arrest Defendant prior to the search of his vehicle.  Cf. United States v. Bolen, 136 F. App'x 325, 328-29 (11th Cir. 2005) (unpublished) (finding probable cause for arrest when a defendant negotiated by instant message and phone communication with an undercover agent to engage in sexual activity with the agent's fictitious three-year-old daughter, and the defendant arranged a meeting and arrived at the meeting place at the planned time); United States v. Godwin, No. 3:08-cr-316-J-32TEM, 2009 WL 151134 (M.D. Fla. Jan. 21, 2009) (unpublished) (finding probable cause for arrest when the defendant communicated through online instant messages with an undercover officer posing as a fourteen-year-old girl, asked the fictitious girl sexually explicit questions, and arrived for an arranged meeting with the fictitious fourteen-year-old girl).

The Supreme Court recently clarified that, "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Gant, 129 S. Ct. at 1723.  Thus, a warrantless search of a vehicle may be conducted incident to the lawful arrest of a recent occupant only if one of these two situations exists.  Id. at 1716, 1723.

The precise point at which Defendant was formally arrested is not entirely clear.  The circumstances would seem to suggest Defendant was arrested prior to the search. Defendant was removed from his vehicle at gunpoint, placed in handcuffs, issued Miranda

warnings, and taken to a police office building. However, Detective Jones's statements muddle the sequence of events somewhat. See Gov. Ex. 1 at 3:00-3:07, 4:09-4:14 (Detective Jones stating–outside of Defendant's presence–that "Mr. Deal is under arrest–or, in custody, rather"). Defendant seems to acknowledge that the police had already determined they were going to arrest Defendant upon his arrival at Dave and Buster's, as he argues that he was misled because Detective Jones said they might be able to "straighten some of this out." Motion to Suppress Statements at 2-3.

Be that as it may, when a formal arrest follows "quickly on the heels" of a challenged search, "'it is not particularly important that the search preceded the arrest rather than vice versa.'" United States v. Goddard, 312 F.3d 1360, 1364 (11th Cir. 2002) (quoting Rawlings v. Kentucky, 448 U.S. 98 (11th Cir. 1996)); Harris v. United States, 389 F.2d 727, 730 (5th Cir. 1968); see also United States v. Riley, 351 F.3d 1265, 1269 (D.C. Cir. 2003); United States. Hernandez, 825 F.2d 846, 852 (5th Cir. 1987). This is not to say, of course, that any fruits of such a search may be used as the basis for probable cause to make the arrest. Bailey v. United States, 389 F.2d 305, 308 (D.C. Cir. 1967). Rather, if there is already probable cause for an arrest, as there was here, then a warrantless search incident to arrest conducted shortly before the formal arrest is permissible. See Goddard, 312 F.3d at 1364; Harris, 389 F.2d at 730; United States v. Donaldson, 793 F.2d 498, 502-03 (2d Cir. 1986).

### a. Area Within Defendant's Reach

If an arrestee can access the interior of a vehicle, a warrantless search of the vehicle is permissible for the reasons expressed in New York v. Belton, 453 U.S. 454 (1981) and Chimel v. California, 395 U.S. 752 (1969). "The exception derives from interests in officer

safety and evidence preservation that are typically implicated in arrest situations." <u>Gant</u>, 129 S. Ct. at 1714. Such a warrantless search may be conducted of the area within an arrestee's "immediate control"; that is, "the area from within which [the arrestee] might gain possession of a weapon or destructible evidence." <u>Gant</u>, 129 S. Ct. at 1714 (citing <u>Chimel</u>, 395 U.S. at 763). Under this "reaching-distance rule," the Supreme Court recently explained, a search incident to arrest for officer safety and evidence preservation purposes is not justified when an arrestee is handcuffed in the back of a patrol car. <u>Gant</u>, 129 S. Ct. at 1716-19.

Here, the search occurred while Defendant was handcuffed and taken into a building at least fifty yards away from the place of the arrest and the location of the vehicle. Tr. at 20, 50, 64. As in <u>Gant</u>, the interior of the vehicle Defendant had recently occupied was not within his immediate control or reach, and there was no reasonable possibility he could have accessed it. Accordingly, the search of the vehicle was not permissible based on the <u>Chimel</u>/<u>Belton</u> exception to the warrant requirement as clarified in <u>Gant</u>.

### b. Evidence of the Offense of Arrest

The second situation in which police may search a vehicle incident to a recent occupant's arrest is "when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." <u>Gant</u>, 129 S. Ct. at 1714 (citing <u>Thornton v. United States</u>, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in judgment)). "Although it does not follow from <u>Chimel</u>, . . . circumstances unique to the vehicle context justify" such searches. <u>Gant</u>, 129 U.S. at 1719. In <u>Thornton</u>, Justice Scalia explained that these searches are grounded

on "a more general interest in gathering evidence." Thornton, 541 U.S. at 629 (citing United States v. Rabinowitz, 339 U.S. 56 (1950)).

For the same reasons that established probable cause to believe the vehicle Defendant was driving contained evidence of criminal activity, see supra at 19-20, there was reason to believe the vehicle might contain evidence that Defendant had solicited a child for unlawful sexual conduct using computer services or devices and had traveled to meet a minor to engage in sexual activity, the crimes for which he was arrested. See Fla. Stat. §§ 847.0135(3) and (4). Therefore, under Gant, the search of the vehicle was not unreasonable.

The warrantless search of Defendant's vehicle was permissible under the automobile exception to the warrant requirement because there was probable cause to believe Defendant's vehicle contained evidence. In addition, the search was permissible because it was conducted incident to Defendant's lawful arrest and there was reason to believe the vehicle might contain evidence of the crime for which he was arrested. Accordingly, the undersigned recommends that the Motion to Suppress Physical Evidence be denied.

### B. Motion to Suppress Statements

The requirement that a confession be voluntary to be admitted into evidence is based on the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment. Dickerson v. United States, 530 U.S. 428, 433 (2000). In Miranda v. Arizona, 384 U.S. 436, 479 (1966), the Supreme Court announced a "prophylactic" rule to protect against violations of the Self-Incrimination Clause. Withrow v. Williams, 507 U.S. 680 at 690-91 (1993) (collecting cases); see also Dickerson, 530 U.S. at 437-38. Thus, two

distinct questions may arise in the context of a suspect's statements to the police: whether the suspect validly waived his or her <u>Miranda</u> rights; and whether the defendant's statements to the police were voluntary. <u>See</u> <u>Dickerson</u>, 530 U.S. at 444 (stating that the "requirement that <u>Miranda</u> warnings be given does not, of course, dispense with the voluntariness inquiry") (dicta).

Under <u>Miranda</u>, an individual taken into custody must be advised that "he has the right to remain silent, that any statement he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." <u>Miranda</u>, 384 U.S. at 479. A suspect may waive his or her <u>Miranda</u> rights, "provided that the waiver is made voluntarily, knowingly, and intelligently." <u>Id.</u> Courts look to two areas of inquiry to determine whether a waiver of a suspect's constitutional rights was valid:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude <u>Miranda</u> rights have been waived.

<u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (quoting <u>Fare v. Michael C.</u>, 442 U.S. 707, 725 (1979)). A waiver of one's <u>Miranda</u> rights need not be express to be valid. <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979). The question is "whether the defendant in fact knowingly and voluntarily waived the rights delineated in the <u>Miranda</u> case." <u>Id.</u> When a suspect speaks to law enforcement officers of his own free will after being advised as required by <u>Miranda</u>, a waiver of those rights may be implied. <u>See</u> <u>Mincey v. Head</u>, 206

F.3d 1106, 1131 (11th Cir. 2000); see also United States v. Cardwell, 433 F.3d 378, 389-90 (4th Cir. 2005).

Aside from the validity of a waiver of one's Miranda rights, due process requires that a confession be voluntary to be admitted at trial. See Colorado v. Connelly, 479 U.S. 157, 163 (1986). In assessing whether a confession is voluntary, courts look to the totality of the circumstances to determine "whether a defendant's will was overborne at the time he confessed," or whether the confession was the product of rational intellect and free will. Reck v. Pate, 367 U.S. 433, 440 (1961); see also Arizona v. Fulminante, 499 U.S. 279, 285-86 (1991); Connelly, 479 U.S. at 176-77. The inquiry typically focuses on police overreaching. Connelly, 479 U.S. at 163-64. Relevant factors include the defendant's age, the defendant's education, the defendant's intelligence, whether Miranda warnings were given, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as deprivation of food or sleep. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The voluntariness inquiry with respect to confessions is highly similar, if not identical, to the inquiry into the voluntariness of a waiver of Miranda rights. Connelly, 479 U.S. at 169-70 (stating that "[t]here is obviously no reason to require more in the way of a 'voluntariness' inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context"); United States v. Cristobal, 293 F.3d 134, 140 (4th Cir. 2002) (stating that courts "engage in the same inquiry when analyzing the voluntariness of a Miranda waiver as when analyzing the voluntariness of statements under the Due Process Clause").

Defendant seeks the suppression of his written and oral post-arrest statements on three grounds. First, Defendant argues that the police lacked probable cause to arrest him, and his subsequent statements were the fruit of his illegal arrest. Motion to Suppress Statements at 3. However, for the reasons stated supra at 19-20, there was probable cause to arrest Defendant on both state and federal charges. Because there was probable cause to arrest Defendant, it cannot be said that he was illegally detained or that his statements were the fruit of an illegal detention. See Michigan v. DeFillippo, 443 U.S. 31, 36 (1979).

Second, Defendant asserts that the waiver of his constitutional rights was not valid. Motion to Suppress Statements at 3-6. Specifically, Defendant argues he was given a deceptive and false impression by Detective Jones's statements that the police needed to figure out what was going on, and that they may be able to straighten it out. Id. at 2 (referring to Detective Jones's statements). Third, Defendant contends that the statements he made while in police custody were not voluntary because his "will was overborne by the techniques utilized by the questioning law enforcement officers." Id. at 6. Defendant complains that he was misled when police told him he had been communicating with a real person who had a real mother, rather than the undercover male police officer with whom he had actually been communicating. See id. at 2-3. Defendant contends that this misinformation made him "even more upset than he already [was] and [broke] down his defenses." Id. at 2-3. Defendant further asserts that he had been ill the day of the interview, which he communicated to the police, but "[t]he fact [Defendant] felt sick did not deter his questioners." Id. at 3.

In cases considering the validity of a <u>Miranda</u> waiver, courts on occasion have criticized the use of deception by the police, <u>see, e.g.</u>, <u>Miranda</u>, 384 U.S. at 456-58, and under some circumstances police deception can invalidate a waiver. <u>See</u> <u>Montejo v. Louisiana</u>, 129 S. Ct. 2079, 2100 (2009) (stating in dicta that falsely telling a defendant that he or she had not been appointed counsel "would obviously invalidate an otherwise valid waiver" of the defendant's Sixth Amendment rights) (Alito, J., concurring). Still, "<u>Miranda</u> forbids coercion, not mere strategic deception . . . ." <u>Illinois v. Perkins</u>, 496 U.S. 292, 297 (1990) (holding that an undercover agent who was pretending to be a defendant's fellow prison inmate was not required to give <u>Miranda</u> warnings to the defendant). "[T]rickery or deceit is only prohibited to the extent that it deprives the defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." <u>United States v. Bell</u>, 367 F.3d 452, 461 (5th Cir. 2004).

Similarly, with respect to the voluntariness of confessions, "the police's use of a trick alone will not render a confession involuntary." <u>United States v. Castaneda-Castaneda</u>, 729 F.2d 1360, 1363 (11th Cir. 1984) (holding that the defendant's waiver was voluntary even though police told the defendant his wife had confessed when she had not); <u>see also</u> <u>Frazier v. Cupp</u>, 394 U.S. 731, 739 (1969) (observing that "the fact that the police misrepresented the statements that [the defendant's companion] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible"). When the police deception is "sufficiently free of coercive elements," a confession will not be deemed involuntary. <u>Castaneda</u>, 729 F.2d at 1363.

A defendant's medical condition or physical health can also be an important factor in determining the voluntariness of a confession.  In <u>Mincey v. Arizona</u>, 437 U.S. 385 (1978), the Supreme Court addressed whether a defendant's physical health, in the totality of the circumstances, rendered his statement to the police involuntary.  The defendant was in the intensive care unit of a hospital and had been seriously wounded just a few hours before questioning by the police; at the time of questioning, the defendant "was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus," "depressed almost to the point of coma," and had "unbearable" pain in his leg.  <u>Mincey</u>, 437 U.S. at 398-99.  The police officer ignored the defendant's stated desire not to be interrogated.  <u>Id.</u> at 399.  The Court concluded that the defendant's statements could not be used against him because he "was weakened by pain and shock, isolated from family, friends, and legal counsel and barely conscious, and his will was simply overborne."  <u>Id.</u> at 401-02.

One's medical condition would similarly affect the determination whether <u>Miranda</u> rights were validly waived.  In <u>United States v. Cristobal</u>, 293 F.3d 134 (4th Cir. 2002), explosive devices were detonated by a defendant who alleged that stress over his marital problems had "mutated into delusional psychosis."  <u>Cristobal</u>, 293 F.3d at 137.  When the defendant did not surrender as ordered and pointed a gun at one of the officers, he was shot in the upper chest, right arm and elbow, right shoulder, and ring finger of his right hand.  <u>Cristobal</u>, 293 F.3d at 138.  The defendant was seriously injured and taken to a nearby hospital.  <u>Id.</u>  The next morning, after the defendant had been given pain killers and narcotics, he was questioned by law enforcement officers and waived his <u>Miranda</u> rights.  <u>Id.</u> at 138, 141.  Noting the absence of coercive police activity, the <u>Cristobal</u> Court held that

the defendant had validly waived his constitutional rights.  Id. at 140-43 (explaining that coercive police activity is a necessary predicate to finding that a confession is not voluntary under the Due Process Clause of the Fourteenth Amendment, and "[a]s such, coercive police activity is also a necessary predicate to a finding that a waiver of Miranda rights is not voluntary").  Distinguishing Mincey, the Cristobal Court observed that law enforcement officers had not engaged in coercive tactics, the defendant "never indicated a desire not to confess," and the defendant's answers to questions were lucid and detailed.  Cristobal, 293 F.3d at 143.

Analyzing the facts of this case within the legal framework discussed above, Defendant validly waived his Miranda rights, and his statements to the police were voluntary. With respect to the waiver of Defendant's constitutional rights, the waiver was knowing and intelligent.  Defendant was given Miranda warnings twice–once contemporaneous with his initial detention, Gov. Ex. 1 at 0:56-1:23, and once when he was interrogated in the ICE Office, Gov. Ex. 1 at 9:30-10:42.  See also Tr. at 19, 62, 65.  Defendant stated that he understood his rights, and he signed a written form acknowledging these rights.  Gov. Ex. 1 at 9:30-10:42; Tr. at 19, 62, 65-66; Gov. Ex. 16.  Defendant then answered the questions that were put to him.  At the time, Defendant was twenty-two years old, had graduated from high school, had attended college, and was not under the influence of alcohol or any other drug that influenced his ability to think clearly.  Gov. Ex. 1 at 8:45-9:01, 9:21-9:28.  A review of the audio recording shows that Defendant was lucid, alert, and responsive when he waived his rights.  Defendant understood his constitutional rights, as well as the consequences of abandoning them.

The tactics used by the police did not render Defendant's <u>Miranda</u> waiver invalid or his statements involuntary. The ruse did not deprive Defendant of the ability to understand his rights or the consequences of abandoning them, and the ruse was not so egregious as to overbear his will. <u>Cf.</u> <u>United States v. Grossman</u>, 233 F. App'x 963 (11th Cir. 2007) (unpublished) (finding it was not coercive for the police to engage in a ruse in which a police officer posed as mother who offered to allow the defendant to engage in sexual activity with her fictitious nine-year-old daughter); <u>United States v. Godwin</u>, No. 3:08-cr-316-J-32TEM, 2009 WL 151134, at *5-7 (M.D. Fla. Jan. 21, 2009) (unpublished) (finding that a ruse in which an investigator[17] posed as a fourteen-year-old girl did not render involuntary the defendant's waiver of his constitutional rights). The statement by Detective Jones that "we need to figure some stuff out . . . . Then we'll give you an opportunity to say whatever you want," Gov. Ex. 1 at 0:35-0:54, was not an implied promise. <u>See</u> <u>United States v. Mercer</u>, 541 F.3d 1070, 1075-76 (11th Cir. 2008) (noting that a law enforcement officer's statement that a defendant's cooperation would be conveyed to judicial authorities did not constitute a promise); <u>see also</u> <u>Moore v. Dugger</u>, 856 F.2d 129, 132 (11th Cir. 1988). Nor was Detective Jones's statement a deception that overbore Defendant's will or dispossessed him of a free and deliberate choice as to his rights. Defendant had knowledge enabling him to understand the nature of his rights and the consequences of abandoning them despite the deceptive tactics employed by the police. His confession was the product of a rational intellect and a free will.

---

[17] The investigator in the <u>Godwin</u> case, Investigator Mark Baker, was involved with Defendant's arrest in this case and testified at the April 28, 2009 hearing.

Defendant's lightheadedness and upset stomach did not render his waiver of <u>Miranda</u> rights invalid, and the pursuit of questioning by the police despite Defendant's condition did not render the interrogation coercive. Defendant's physical condition is not comparable to the defendant in <u>Mincey</u>. <u>See</u> <u>Mincey</u>, 437 U.S. at 398-99. Here, Defendant's will and ability to think clearly were not compromised. Defendant may have been mildly ill–he was not seriously injured or suffering from a debilitating illness. There is no indication that he even required medical treatment. The audio recording indicates Defendant understood the circumstances and the importance of the situation. <u>See</u> Gov. Ex. 1.

The methods employed by law enforcement officials did not render Defendant's confession involuntary. The police did not engage in violence or threaten violence. In fact, the police offered Defendant water, and they gave him a garbage receptacle when he said he felt like he was going to vomit. The interrogation lasted less than two hours. Gov. Ex. 1. A review of the audio recording of the interrogation reveals that Defendant cooperated with law enforcement officers. Law enforcement officers advised Defendant of his constitutional rights as required by <u>Miranda</u>, and Defendant acknowledged these rights. Defendant denied Detective Jones permission to search his "Yahoo! friends list," Gov. Ex. 1 at 18:00-18:07, which demonstrates that Defendant understood his rights, and that his will was not overborne. Defendant's statements were the product of a free and deliberate choice rather than intimidation, coercion, or deception.

Under the totality of the circumstances, Defendant validly waived his constitutional rights, and his oral and written statements to the police were voluntary. Accordingly, the undersigned recommends that the Motion to Suppress Statements be denied.

## V.  Conclusion

The evidence obtained during the investigation of Defendant established probable cause to arrest him and to search his vehicle.  Therefore, the search of Defendant's vehicle was permissible under United States v. Ross, 456 U.S. 798 (1982) and Michigan v. Thomas, 458 U.S. 259 (1982).  Because Defendant was lawfully arrested, and there was reason to believe his vehicle would contain evidence of the crime for which he was arrested, the search of Defendant's vehicle was also permissible under Arizona v. Gant, 129 S. Ct. 1710 (2009).  Finally, under the totality of the circumstances, Defendant's oral and written statements to the police were made voluntarily after he validly waived his constitutional rights.

For the reasons stated herein, it is

**RECOMMENDED:**

1.     That Defendant's Motion to Suppress Fruits of Warrantless Search (Doc. No. 39) be **DENIED.**

2.     That Defendant's Motion to Suppress Statements (Doc. No. 40) be **DENIED.**

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on July 29, 2009.

_James R. Klindt_
**JAMES R. KLINDT**
United States Magistrate Judge

jdf
Copies to:

Honorable Marcia Morales Howard,
United States District Judge

Assistant U.S. Attorney (Brown)

Mark Rosenblum, Esquire